UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TOBY FANSLER, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:07-CV-00081 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Toby Fansler, Jr., appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Fansler applied for DIB on July 2, 2003, alleging that he became disabled as of December 15, 2001. (Tr. 10, 23, 53, 61.) The Commissioner denied his application initially and upon reconsideration, and Fansler requested an administrative hearing. (Tr. 23, 36-44.) On October 4, 2005, Administrative Law Judge (ALJ) John S. Pope conducted a hearing at which

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

Fansler, who was represented by counsel, and a vocational expert ("VE") testified. (Tr. 433-70.)

On August 24, 2006, the ALJ rendered an unfavorable decision to Fansler, concluding that he was not disabled despite the limitations caused by his impairments because he could perform a significant number of jobs in the national economy. (Tr. 10-22.)  The Appeals Council denied Fansler's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-7.)  Fansler filed a complaint with this Court on April 6, 2007, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. FANSLER'S ARGUMENTS

Fansler alleges two flaws with the Commissioner's final decision.  Specifically, Fansler claims that (1) the ALJ improperly evaluated the opinion of Dr. Mark Rollins, his treating family practitioner, and (2) the ALJ erred by determining that his testimony of debilitating limitations was "not entirely credible." (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 11-13.)

## III. FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Fansler was thirty-eight years old, had obtained his GED, and possessed work experience as a production worker and forklift operator. (Tr. 50, 65, 84.)  Fansler states that he is disabled due to high blood pressure, degenerative disk disease of the cervical spine and L4-5, arthritis of the spine, headaches, obesity, and mood disorder. (Opening Br. 2.)

---

[2] The administrative record in this case is voluminous (470 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

At the time of the hearing, Fansler stated that he lived with his parents in a one-story home. (Tr. 440.)  Fansler explained that though he has trouble bending forward to reach his feet, he is able to adequately dress and bathe himself; he also stated that he performs some household tasks, such as laundry and dishes. (Tr. 453-55.)

As to his physical capacity, Fansler testified that he could lift only three to five pounds; walk or stand just one hour in an eight-hour workday; and sit "about an hour, hour and a half." (Tr. 461.)  He further stated that he experiences back pain "probably 80 or 90 percent of [every] day" and has headaches "at least four times a week." (Tr. 460.)  Fansler explained that his headaches can at times cause blurred vision and vomiting, and that they last anywhere from six hours to four days. (Tr. 463-64.)  To help relieve his pain, Fansler takes medication, though it causes him to feel drowsy at times; lies down in a dark room; and takes frequent hot showers. (Tr. 450.)

As to his mental health, Fansler testified that he suffers from depression and anxiety and that he experiences panic attacks once or twice a week. (Tr. 456.)  After a panic attack, Fansler explained that he must lie down for several hours in a cool place because otherwise he feels like he is "going to fall down." (Tr. 456-57.)

   *B. Summary of the Medical Evidence Pertaining to Fansler's Physical Health*

In 1996, Fansler visited Dr. Charles Kershner due to experiencing back pain and occasional numbness in his right leg. (Tr. 114.)  Fansler saw Dr. Kershner several times and then was released to return to work. (Tr. 111, 113.)

In December 2002, Fansler visited Dr. Mark Rollins, his family practitioner, due to complaints of chronic low back pain and high blood pressure. (Tr. 102.)  On physical exam, Dr.

3

Rollins noted some tenderness in the lower lumbar spine with some paravertebral hypertonicity but that Fansler had good range of motion. (Tr. 102.)  He assigned a diagnosis of chronic low back pain and hypertension and suggested conservative treatment, prescribing medication and stretching exercises. (Tr. 102.)

On July 7, 2003, Fansler was seen by Teresa Templin, a nurse practitioner in Dr. Rollins's office, explaining that he had lost his health insurance after his December 2002 visit to Dr. Rollins and only recently had become insured again. (Tr. 100-01, 402.)  Fansler described a long history of back and neck pain to Nurse Templin, rating it currently as a "5" on a ten-point scale; he also complained that he got headaches from his pain. (Tr. 100-01.)  He also admitted that he had not consistently taken his blood pressure medication due to his financial status. (Tr. 100-01.)  She recommended that he undergo an MRI, adjusted his medication, and advised him to decrease his lifting. (Tr. 100-01.)  The MRI of Fansler's spine showed mild degenerative disk disease at C5-C6 and L4-L5, but the MRI of his brain was normal. (Tr. 178, 181.)  At a follow-up visit on July 21, 2003, Nurse Templin noted that Fansler still complained of pain in his lower back and cervical spine. (Tr. 98.)  His blood pressure was 160/100; Nurse Templin hoped that once Fansler's blood pressure came down that his headaches would reduce. (Tr. 98.)  She saw Fansler at least eight more times between July 2003 and July 2004 for his complaints of back pain, headaches, and hypertension. (Tr. 392-403.)

In an undated, handwritten "Medical Statement," Dr. Rollins stated that Fansler had back pain, headaches, and hypertension and that he could lift no more than ten pounds; could stand no more than eight hours per day or forty hours per week; and should not bend, climb, or step. (Tr. 97.)  He also reported that he was referring Fansler to an orthopaedic specialist for further

4

evaluation and treatment. (Tr. 97.)

On July 23, 2003, Dr. Kershner wrote a letter to Dr. Rollins, indicating that he had seen Fansler for his low back and neck pain. (Tr. 95, 109-10.)  Dr. Kershner reported that x-rays of Fansler's lumbar spine showed "degenerative joint disease L4-5 with moderate bulge primarily mid-line." (Tr. 95, 110.)  He also stated that on physical examination, Fansler demonstrated normal and equal knee and ankle jerks, good strength of his extensor hallucis longus, and that he could flex fingertips to his knees. (Tr. 95, 109.)  He further reported that Fansler's straight leg raising test was negative and that Fansler was able to heel and toe walk. (Tr. 95, 109.)  Dr. Kershner diagnosed him with arthritis of the spine and prescribed medication. (Tr. 95, 109.)

On August 26, 2003, Dr. Elpidio Feliciano evaluated Fansler at the request of the state agency for his back problems and hypertension. (Tr. 115.)  Fansler rated his pain as an "8" to "9" on a ten-point scale, describing it as sharp and constant. (Tr. 115.)  On physical exam, Fansler's gait and posture were normal, he was able to walk on toes and heels and perform tandem walking, and he could hop or squat and stand up from a squatted position. (Tr. 116.)  Range of motion and a neurological exam were normal, though Dr. Feliciano noted mild tenderness to palpation on the lumbar spine and mid-thoracic spine. (Tr. 116.)  Dr. Feliciano further documented that Fansler's muscle strength was 5/5 in all extremities, that his muscle tone and fine finger skills were normal, and that his sensory system was intact. (Tr. 116.)

On September 22, 2003, Dr. W. Bastnagel, a state agency physician, reviewed Fansler's medical record and opined that he could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; was unlimited in his ability to push and/or pull with his extremities; and could occasionally climb, balance, stoop,

5

kneel, crouch, and crawl. (Tr. 118-25.)  A second state agency physician later affirmed Dr. Bastnagel's opinion. (Tr. 125.)

In January 2004, Fansler followed-up with Nurse Templin concerning his back and chest pain. (Tr. 398.)  He stated that he had been without blood pressure medication for three to four months because of his financial status. (Tr. 398.)  An EKG showed some "T-wave abnormalities, possible strained rhythm demonstrating some cardiac strain probably secondary to continued and chronic elevated blood pressure." (Tr. 398.)  He was given nitroglycerine tablets for his chest pain. (Tr. 398.)  An echocardiogram on January 23, 2004, revealed a slightly dilated aortic root with the left atrial size at the upper limits of normal, but was otherwise normal. (Tr. 162-67.)  A treadmill stress test was negative for ischemia at low level exercise. (Tr. 162-67.)

On February 10, 2004, Dr. Syed Umer examined Fansler upon referral by Dr. Rollins due to Fansler's complaints of intermittent chest pain of one year duration. (Tr. 126-27.)  Fansler told Dr. Umer that he had fainted twice in the last six months, felt dizzy "off and on," and felt a fluttering in his chest at times. (Tr. 126-27.)  An electrocardiogram revealed normal sinus rhythm and was otherwise unremarkable. (Tr. 127.)  He assigned a diagnosis of atypical chest pain, syncope, and EKG changes and scheduled Fansler for further testing. (Tr. 127.)

On April 22, 2004, Fansler complained to Nurse Templin of numbness in his left hand, which worsened at night. (Tr. 392.)  On physical exam, Fansler demonstrated good and equal grip strength in his upper extremities and good sensation in his distal fingertips. (Tr. 392.)  Fansler declined to undergo a nerve conduction study because he did not have insurance at the time. (Tr. 392.)

An MRI of Fansler's lumbar spine on April 13, 2005, revealed degenerative disk disease

6

at L4-L5, though the radiologist noted that there did not appear to be any apparent neurological affect. (Tr. 406.)

### C. Summary of the Medical Evidence Pertaining to Fansler's Mental Health

On July 15, 2004, Fansler was evaluated by a physician at Grant-Blackford Mental Health because he felt nervous all the time. (Tr. 143-52.) He was diagnosed with a mood disorder due to his back disease and cannabis dependence and was assigned a Global Assessment of Function (GAF) of 40.[3] (Tr. 150.)

One month later, Fansler was evaluated by Dr. Dennis Ugboma, a psychiatrist. (Tr. 138-40.) Fansler told Dr. Ugboma that his anxiety symptoms were of two to three years duration and that he experiences panic attacks up to three times per week, though his symptoms did not prevent him from going to public places. (Tr. 138-40.) He denied other depressive symptoms. (Tr. 138-40.) He reported that he had tried various medications for his mental health but had discontinued them because of side effects; consequently, he refused to try anti-depressant therapy. (Tr. 138-40.) Dr. Ugboma assigned a diagnosis of anxiety disorder NOS, rule out depressive disorder NOS, and cannabis dependence. (Tr. 140.) He rated his current GAF at 65, noting that his highest GAF during the last year was 90 and that his lowest was 30.[4] (Tr. 140.)

---

[3] A GAF score is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). A GAF score of 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed person avoids friends, neglects family, and is unable to work). *Id.*

[4] A GAF score of 65 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. American Psychiatric Association, *supra* note 3, at 34.
   A GAF score of 90 indicates absent or minimal symptoms (e.g., mild anxiety before an exam), good

7

Fansler returned to Dr. Ugboma one month later, reporting that he had experienced several panic attacks recently. (Tr. 133.)  In fact, he told Dr. Ugboma that he stopped taking one of his medications because he thought it may have precipitated a panic attack; he denied any depressive symptoms. (Tr. 133.)  On mental status exam, Fansler's affect was constricted but otherwise unremarkable. (Tr. 133.)  He was advised to resume taking his medications as prescribed and to refrain from using marijuana. (Tr. 133.)  Fansler was seen by Dr. Ugboma at least seven more times before August 2005, for medication adjustments. (Tr. 129, 133, 427-31.)  At his May and July 2005 appointments, Fansler stated that his anxiety was relatively well controlled, that he had not been experiencing panic attacks recently, and that his mood was fine. (Tr. 427-28.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d

---

functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members). *Id.*

A GAF score of 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to unction in almost all areas (e.g., stays in bed all day; no job, home, or friends). *Id.*

863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On August 24, 2006, the ALJ rendered his opinion. (Tr. 10-22.)  He found at step one of the five-step analysis that Fansler had not engaged in substantial gainful activity since his alleged onset date and at step two that his degenerative disk disease, arthritis, and anxiety and depression were severe impairments. (Tr. 17.)  At step three, he determined that Fansler's impairment or combination of impairments was not severe enough to meet a listing. (Tr. 18.) Before proceeding to step four, the ALJ found Fansler's subjective complaints "not entirely credible" and assigned him the following RFC:

> [T]he claimant has the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for about six hours out of an eight-hour workday; the claimant can sit for about six hours out of an eight-hour workday; the claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl; the claimant is limited to jobs requiring only occasional contact with the public, co-workers and supervisors.

(Tr. 18.)

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Based on this RFC and the VE's testimony, the ALJ determined at step four that Fansler was unable to perform his past relevant work as a production worker or forklift operator, which Fansler testified he performed at the heavy exertional level. (Tr. 20.)  The ALJ then concluded at step five that Fansler could perform a significant number of jobs within the national economy, including electrical accessories assembler, production worker-small parts, and injection molding machine operator. (Tr. 21.)  Therefore, Fansler's claim for DIB was denied. (Tr. 21-22.)

*C.  The ALJ's Evaluation of the Opinion of Dr. Rollins, Fansler's Treating Physician, Is Not Supported by Substantial Evidence*

Fansler first argues that the ALJ improperly evaluated the opinion of Dr. Rollins, his treating family practitioner. (Opening Br. 11-12.)  Fansler's argument is ultimately persuasive.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5)

11

whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner, *id*.; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ summarily rejected Dr. Rollins's opinion, stating that it was "not supported by the objective medical evidence." (Tr. 15.)  More specifically, the ALJ reasoned: "[T]he undersigned does not give controlling weight to the medical opinion of Dr. Rollins, because it is not supported by the objective medical evidence.  The claimant's strength testing was normal and does not indicate that he would be limited to lifting up to 10 pounds." (Tr. 15.) Instead, the ALJ relied upon the opinion of the non-examining state agency physicians, explaining rather conclusorily that their opinion "is more consistent with the medical record," and therefore is entitled to "greater weight." (Tr. 15.)

The ALJ's decision to reject Dr. Rollins's opinion, however, is not supported by substantial evidence.  To explain, the sole example of the purportedly inconsistent objective medical evidence provided by the ALJ with respect to Dr. Rollins's opinion – that Fansler exhibited normal muscle strength – fails to build an accurate and logical bridge between the

12

evidence and his conclusion. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) (collecting cases that state an ALJ is required to build an accurate and logical bridge between the evidence and his conclusion so that a court may afford the claimant a meaningful review).

To explain, Rollins's chief complaint is pain, *not* muscle weakness; the ALJ has not pointed to, nor does a review of the record reveal, a medical opinion that articulates an individual's muscle strength must be diminished if he is suffering from chronic pain.  Rather, it appears that the ALJ succumbed to the temptation to "play doctor" when he independently concluded that normal muscle strength is inconsistent with chronic pain. *See, e.g., id.* at 570; *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (emphasizing that an ALJ must not make independent medical findings about whether certain activities are inconsistent with a particular medical diagnosis); *Alexander v. Barnhart*, 287 F. Supp. 2d 944, 963-64 (E.D. Wis. 2003) (holding that it was improper for the ALJ to conclude that the claimant did not display the necessary symptoms of fibromyalgia, as the ALJ was not an expert at diagnosing such a condition).  Thus, the ALJ's stated reason for rejecting Dr. Rollins's opinion fails to support his conclusion.

Moreover, the ALJ also erred when he failed to properly evaluate Dr. Rollins's opinion for purposes of assigning it an appropriate weight after he concluded that it did not merit controlling weight.  When a treating physician's opinion is found to be inconsistent with or not well supported by the evidence in the record, and is thus not entitled to controlling weight, the opinion is still entitled to deference and must be weighed using the factors in 20 C.F.R. § 404.1527. *See generally Books*, 91 F.3d at 979 (articulating that when conflicting medical evidence exists, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1527); *Rohan*, 98

F.3d at 971.  Here the ALJ simply dismissed Dr. Rollins's opinion, never discussing the length of Fansler's treatment relationship with Dr. Rollins, the frequency of examination, the nature and extent of the treatment relationship, or Dr. Rollins's area of practice. *See generally Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[An] ALJ must take into account the treating physician's ability to observe the claimant over a longer period of time.").

In sum, the ALJ's rejection of Dr. Rollins's opinion is not supported by substantial evidence, and his analysis contains legal error.  The Commissioner's decision will be remanded so that the ALJ may properly evaluate Dr. Rollins's opinion, building an accurate and logical bridge between the evidence of record and the ALJ's ultimate conclusion.

### D.  The ALJ Improperly Rejected Fansler's Testimony Regarding His Headaches

Fansler also contends that the ALJ erred in determining his credibility, stating that the ALJ improperly rejected his testimony of debilitating limitations arising from his headaches.[6] (Opening Br. at 12-13.)  Ultimately, Fansler's attack on the ALJ's credibility analysis is successful.

An ALJ must follow a two-step process when evaluating a claimant's own description of his impairments. *See* 20 C.F.R. § 404.1529; *Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); SSR 96-7p.  First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment (that is, an impairment that can be shown by

---

[6] In addition, Fansler argues that the ALJ erred when assessing his credibility by failing to consider the impact of his psychiatric problems on his physical impairments. (Opening Br. 12-13.)  Indeed, when a claimant has several medical problems, the ALJ must consider the claimant's condition as a whole. *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006); *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).  Here, the RFC assigned by the ALJ did indeed contemplate Fansler's mental status in addition to his physical impairments, limiting him to "jobs requiring only occasional contact with the public, co-workers and supervisors." (Tr. 13.)  Nonetheless, because a remand is indicated on other grounds, the Court ultimately does not need to reach this argument.

14

medically acceptable clinical and laboratory diagnostic techniques) that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. § 404.1529; *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); SSR 96-7p.  If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p.

If, however, the medical evidence shows the existence of an underlying impairment that could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see also* 20 C.F.R. § 404.1529(c); *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); *Williams*, 915 F. Supp. at 964.  "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects."[7] SSR 96-7p.

Here, at step two of his analysis, the ALJ summarily rejected Fansler's assertions of an impairment in connection with his complaints of debilitating headaches.  The ALJ stated: "The claimant also alleges that he experiences frequent headaches.  The medical evidence does not establish a cause or treatment for headaches.  Therefore, the undersigned finds that this is an undeterminable medical impairment." (Tr. 12.)  Thus, in short, the ALJ discarded Fansler's

---

[7] When making a credibility determination, the ALJ may not reject a claimant's statements concerning his symptoms solely on the ground that they are not substantiated by objective medical evidence. 20 C.F.R. § 404.1529; *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.1994).  Rather, the ALJ must consider, in addition to the objective medical evidence, the entire case record to determine whether the claimant's statements are credible. *Luna*, 22 F.3d at 691.  "Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. *Id.*; *see also* 20 C.F.R. § 404.1529(c).

15

complaints of headaches at step one of the two-step process, concluding that they lacked the support of medical signs or laboratory findings; therefore, the ALJ never reached the second step of the process – that is, he did not engage in a credibility determination – with respect to Fansler's complaints of headaches.

The ALJ's decision at this juncture, however, was premature and lacks the support of the record. To explain, Nurse Templin of Dr. Rollins's practice indicated that Fansler's headaches were likely caused by his hypertension, stating that "once the blood pressure comes down, hopefully [his] headache[s] wi[ll] ease up." (Tr. 401.) Thus, contrary to the ALJ's assertion, the medical evidence does indeed suggest a cause for Fansler's headaches – that is, that the headaches are caused by his hypertension. *See generally Goodman v. Barnhart*, No. 02-C-520-C, 2003 WL 23218466, at *11 (W.D. Wis. July 3, 2003) (recommending a remand where the ALJ's suggestion that there was no underlying medically determinable impairment that could reasonably be expected to produce claimant's symptoms was not supported by the record). Moreover, the record evidences that Fansler was prescribed a prescription medication (Darvocet) for his headaches as well as medication for his hypertension, indicating that, contrary to the ALJ's assertion, Fansler did in fact receive treatment for his headaches. In that same vein, the record reflects that Fansler voiced numerous complaints of headaches to his health care providers. (*See, e.g.*, Tr. 97, 400-03.)

Admittedly, as the Commissioner points out, the MRI of Fansler's brain was negative, he was prescribed medication for his hypertension,[8] and no medical source of record specifically

---

[8] The Commissioner acknowledges that Fansler, on at least one occasion, had stopped taking his blood pressure medications due to his financial condition. (Mem. in Supp. of the Commissioner's Decision 24.) On that score, "[t]he Commissioner may not deny benefits to a claimant if a condition that would be a severe impairment is remediable, but the claimant cannot afford the necessary medical treatment." *Meroki v. Halter*, No. 00 C 2696, 2001

16

assigned Fansler limitations due to his headaches.  Nonetheless, "regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).  Here, the ALJ misconstrued the medical evidence when he stated that there was no "cause or treatment" in the record for Fansler's headaches, and thus seemingly erred by rejecting Fansler's complaints of debilitating headache symptoms without ever engaging in a credibility analysis about them.[9]

Furthermore, the ALJ never expressly addressed Fansler's hypertension at step two of his analysis when determining the severity of Fansler's impairments. *See Lopez-Navarro v. Barnhart*, 207 F. Supp. 2d 870, 882 (E.D. Wis. 2002) (noting that claimant's uncontrolled hypertension, which caused complaints of headaches and occasional dizziness, could be a severe impairment).  The omission of any discussion of Fansler's hypertension at step two leaves the Court to wonder whether the ALJ failed to consider it or whether he intentionally omitted it because he thought it was not severe. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (opining that when probative evidence is left unmentioned by the ALJ, the court

---

WL 668951, at *10 (N.D. Ill. June 14, 2001); *see* SSR 82-59.

[9] The ALJ did indeed engage in a credibility analysis, but only with respect to Fansler's complaints about his back.  Specifically, the ALJ stated:

> The medical evidence reveals that the claimant's degenerative disc disease is mild and the findings are inconsistent with the claimant's testimony that he is unable to stand for one hour or that he is limited to sitting for one to one and one half hours.  Further, the objective medical evidence revealed normal range of motion, negative straight leg rising, and normal strength.  These findings do not support that the claimant requires the need to lie down for hours during the day.  Therefore, the undersigned finds that the claimant's testimony is less than fully credible.

(Tr. 15.)

17

is left to wonder whether it was even considered); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review.").

Consequently, upon remand to the Commissioner, the ALJ should re-examine the medical evidence of record concerning Fansler's hypertension and headaches and his testimony of debilitating limitations arising from his headaches.

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in according with this Opinion.  The Clerk is directed to enter a judgment in favor of Fansler and against the Commissioner.

SO ORDERED.

Enter for this 19th day of February, 2008.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge